# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **FAITH GASTON**, *et al.*, | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| v. | ) | **Civil Case No. 18-1703 (RJL)** |
| | ) | |
| **DISTRICT OF COLUMBIA,** | ) | |
| | ) | **FILED** |
| **Defendant.** | ) | |
| | | **AUG - 5 2019** |

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

## MEMORANDUM OPINION
(August 2, 2019) [Dkt. ## 10, 11]

Faith Gaston and her minor child B.G. (collectively, "plaintiffs") brought this action against the District of Columbia ("District" or "defendant") for injunctive and declaratory relief under the Individuals with Disabilities Education Act, 20 U.S.C. §§ 1400 *et seq*. *See* Compl. [Dkt. # 1]. Plaintiffs claim that the District violated the IDEA by denying B.G. a free appropriate public education when it failed to provide her with an appropriate individual educational program during the 2017–18 academic year. *See id.* at ¶ 1.

Pending before me are the parties' cross-motions for summary judgment. *See* [Dkt. ## 10, 11]. Upon consideration of the briefing, the relevant law, and the entire record herein, and for the reasons stated below, plaintiffs' motion for summary judgment is **GRANTED** and defendant's cross-motion for summary judgment is **DENIED**.

## BACKGROUND

B.G. is a minor child eligible to receive special education and related services under the Individuals with Disabilities Education Act ("IDEA") as a student with a disability. *See* 20 U.S.C. §§ 1400 *et. seq.* Defendant is a municipal corporation that receives federal funds pursuant to the IDEA and is obligated to comply with the IDEA. *See id.* §§ 1411, 1412(a)(1)(A).

### A. Statutory Background

The IDEA provides that states and territories, including defendant, that receive federal educational assistance must establish "policies and procedures to ensure," among other things, that a free appropriate public education ("FAPE") is available to disabled children. *See id.* § 1412(a)(1)(A). In order to provide such children with a FAPE, a school district must create and implement an individualized education plan ("IEP"), "which is the 'primary vehicle' for implementing the [IDEA]." *Lesesne ex rel. B.F. v. District of Columbia*, 447 F.3d 828, 830 (D.C. Cir. 2006) (quoting *Honig v. Doe*, 484 U.S. 305, 311 (1988)). An IEP is developed through "meetings with a representative of the school district, teachers, parents or guardians, and the child if appropriate." *Honig*, 484 U.S. at 311. Among other things, it "lays out the specialized educational services the child will require to meet" the goals that the team establishes for him or her. *Id.*

Under the IDEA, a parent of a disabled child who is dissatisfied with a school district's "provision of a [FAPE] to such child," 20 U.S.C. § 1415(b)(6), may present their arguments in an "impartial due process hearing," *id.* § 1415(f). At the hearing, the parties are permitted to put on evidence and expert testimony about the child's educational and

2

functional needs. *Id.* § 1415(f), (h). An independent hearing officer will then consider the evidence presented and issue a "determination of whether the child received a [FAPE]." *Id.* § 1415(f)(3)(E). A party aggrieved by the hearing officer's determination may bring a civil action in state or federal court. *Id.* § 1415(i)(2).

## B. Factual Background

B.G. is a fourteen-year-old female student, a resident of the District of Columbia, and the adopted child of Ms. Gaston. AR5, 321, 571–74.[1] B.G. faced a number of serious hardships as a young child, including in utero exposure to drugs and alcohol as well as physical abuse and introduction to dangerous and violent situations. AR84. Perhaps consequently, B.G.'s childhood and adolescence have been marked by a longstanding and well-documented history of academic and behavioral challenges. AR6, 62–82, 96–109, 168–82, 579–81. In the fourth grade, B.G. was formally diagnosed with attention deficit hyperactive disorder ("ADHD"). AR171. She was enrolled in private schools through the seventh grade but was removed during the 2016–2017 school year after an altercation with other students. AR63, 93, 171.

In 2016, while still in private school, B.G. was referred to the District of Columbia Public Schools ("DCPS") for special education testing. At that point, B.G. was twelve years old and enrolled as a seventh grader at DuPont Park Adventist School. AR51. DCPS convened a multidisciplinary team ("DCPS team") meeting on October 18, 2016 to discuss

---

[1] The District submitted a record of the administrative proceedings that have taken place in this matter. *See* Administrative Record [Dkt. ## 8, 9]. Specific pages in the administrative record are cited herein as "AR___."

B.G.'s circumstances and determine how to move forward. AR6, 51, 54, 62. B.G. was referred for an initial psychological and educational evaluation, which DCPS psychologist Dr. Leah Nathan prepared on January 26, 2017. AR62. In the course of her evaluation, Dr. Nathan interviewed, among others, B.G.'s teachers, who reported that B.G. struggled with basic computation and reading skills and that she frequently acted out in negative ways. AR64–65. Dr. Nathan also performed a series of tests; B.G. measured poorly in verbal comprehension, fluid reasoning, and behavioral functioning. AR65–77. Dr. Nathan opined that based on B.G.'s ADHD and her history of academic and behavioral problems, B.G. appeared to meet the criteria for classification as a student with an "other health impairment." AR77. Dr. Nathan recommended that B.G. receive, among other things, a behavior intervention plan and counseling. AR81.

On February 23, 2017, the DCPS team met to review and discuss Dr. Nathan's report. AR89. Consistent with Dr. Nathan's recommendations, the team classified B.G. as "other health impairment" based on her ADHD and determined that B.G. was eligible for special education services. AR6, 90. The team also decided that a draft IEP should be developed for B.G. and reviewed in March 2017. AR90. A few weeks later, B.G. was involved in a physical altercation with other students and transferred from DuPont Adventist to the public Kramer Middle School. AR93, 171.

The DCPS team met again on March 24, 2017 to review B.G.'s IEP. AR123. The March 2017 IEP called for B.G. to receive ten hours per week of specialized instruction and three hours per month of behavioral support services, both within the general education setting. AR118. Notwithstanding the IEP, B.G. ended the 2016–2017 academic year with

4

poor grades, including a D in English, a D+ in Reading Support, and an F in Science. AR159–60.

B.G. continued her enrollment in Kramer for the 2017–2018 school year. On July 28, 2017, independent psychologist Dr. Natasha Nelson conducted a comprehensive psychological evaluation of B.G., which Dr. Nelson updated on September 25, 2017. AR168. Dr. Nelson found that B.G., who was set to enter the eighth grade, was reading at the third-grade level and writing at the fifth-grade level, and that her math skills were at the fourth-grade level. AR173–74. Dr. Nelson observed that B.G. "appear[ed] to suffer from affective disorder that is rooted in depression"; she diagnosed B.G. with an unspecified depressive disorder (in addition to her preexisting ADHD diagnosis). AR177–78. Based on these diagnoses, Dr. Nelson recommended that, together with B.G.'s "other health impairment" classification for ADHD, B.G. "be classified under the special education category of emotional disturbance." AR178.[2] Dr. Nelson further recommended that B.G. receive fifteen hours per week of "pull out" special education instruction outside of the general education setting in reading and math as well as "inclusion supports" in all of B.G.'s other academic classes. AR178. In this context, by "inclusion supports" Dr. Nelson meant that a special education teacher would work with B.G. in her general education classroom on all subjects except reading and math. AR501. Dr. Nelson also

---

[2] A DCPS psychologist reviewed Dr. Nelson's report in October 2017 and disagreed with Dr. Nelson's recommendation that B.G. be classified as having an emotional disturbance. AR202.

recommended that B.G. receive one hour per week of counseling, a functional behavioral assessment, a behavior intervention plan, and extended school year services. AR at 179.

B.G.'s academic and behavioral performance continued to deteriorate during the 2017–2018 school year at Kramer. In early September 2017, B.G. was involved in a violent altercation with other students. AR163, 165. On October 16, 2017, B.G. received her first term report card, which reflected grades of F in Math, Science, English, and her Reading Workshop. AR194. Two days later, social worker Camilla Smith prepared a functional behavior assessment of B.G. AR203. In her report, social worker Smith noted that B.G.'s behavioral problems were impeding her academic progress, that she disengaged in the classroom, that she frequently left the classroom for long periods of time, and that during the first two months of the 2017–2018 school year B.G. had accumulated nineteen disciplinary referrals. AR203–08. The assessment also summarized interviews with B.G.'s teachers—each of whom stated that B.G. continued to struggle academically and behaviorally—and recounted classroom observations, which showed B.G. sleeping during class and otherwise being disruptive. AR207–08. Over the course of "three formal and one informal observations," social worker Smith wrote that B.G. "was appropriate and engaged 35%," "inattentive 25%," and "academically disengaged 40%" of the total time of observation. AR208. A behavior intervention plan was developed for B.G. on the same day as the functional behavior assessment. AR211.

Just one week later, on October 25, 2017, the DCPS team met to review and revise B.G.'s March 2017 IEP as necessary. AR218. During the meeting, a Kramer assistant principal, Jacqueline Walters, expressed the school's view that because B.G.'s functional

behavior assessment and behavior intervention plan "were just developed," the school "need[ed] an opportunity to implement [them] and monitor [B.G.'s] progress." AR219. Plaintiffs disagreed, stating that B.G. needed to be transferred from Kramer to a full-time therapeutic setting. AR219; *see also* AR226 (November 28, 2017 email from plaintiffs' counsel to Kramer "again requesting a change in location of services"). The DCPS team made no changes to B.G.'s March 2017 IEP.

The DCPS team met again on December 6, 2017 to review B.G.'s IEP. AR239–50, 253. The decline in B.G.'s academic performance and behavior over the intervening months had been dramatic; B.G. was now failing all of her classes except music. AR253, 261–62. The DCPS team reviewed reports from B.G.'s teachers, who commented that she was not doing her homework and lacked initiative, that she was coming late to class, and that she was engaging in horseplay. AR253. During the meeting, social worker Smith observed that B.G. "seems to be declining," although she and others noted that B.G. performed well in one-on-one settings. AR254. Plaintiffs' counsel again stated that B.G. "needs a therapeutic day school." AR253. Dr. Wilma Gaines, an educational advocate for B.G., asked if B.G. could receive "specialized instruction on a full time basis." AR254. The DCPS team rejected those suggestions and revised B.G.'s IEP to add time outside of the general education setting, including ten hours per week of specialized instruction and two hours per month of behavioral support services. AR247–49.

Approximately one month later, in January 2018, B.G. was referred for classroom observation to "assist[] the [DCPS] Team in determining the appropriate educational planning for this student." AR283. In two separate observations, B.G. was seen engaging

7

in a variety of inappropriate behaviors, including walking in the hallways and having to be escorted back by security, randomly yelling out "I hate this class," and walking around the classroom meddling with peers. AR285. B.G. was also tardy arriving to the classroom and pretended to sleep during class. AR286. The observer concluded that B.G. would "benefit from a more restrictive school setting where [her] academic and behavioral needs can be addressed." AR289.

On January 31, 2018, plaintiffs filed an administrative due process complaint alleging that the December 2017 revision to B.G.'s IEP "ha[d] not been sufficient to enable B.G. to access her education." AR293, 307. The complaint further alleged that DCPS had known since September 2017 that B.G. needed "a higher level of restrictiveness" to address her "behavioral regression" and that "[a] minimal increase in hours does not provide B.G. with the setting that she needs." AR308. Plaintiffs contended that DCPS denied B.G. a FAPE by failing to timely review and revise B.G.'s IEP during the 2017–2018 school year to provide for a sufficiently restrictive setting and an adequate increase in behavioral supports in light of B.G.'s regression. AR at 309–11.

On February 2, 2018, the DCPS team met to review the January classroom observations and revise B.G.'s IEP as necessary. AR318. The team revised B.G.'s IEP to provide for 27 hours per week of specialized instruction and four hours per month of behavioral support services, all outside of the general education setting. AR329. On February 14, 2018, DCPS informed plaintiffs that B.G. would be placed in a behavior and education support program at Kramer. AR357.

An administrative due process hearing was held on April 9, 2018. AR439. The "issue to be determined" was whether DCPS had denied B.G. a FAPE by its alleged failure "to provide an appropriate IEP and/or placement and/or location of services for 2017/18 with an IEP developed on 3/24/17 and amended on 12/6/17, because [B.G.] needed a full-time IEP, a sufficiently restrictive setting, increased behavioral supports and proper classification due to academic regression and severe behaviors." AR4; *see also* AR366.

Plaintiffs presented four witnesses at the hearing, including Ms. Gaston and two qualified experts. Dr. Nelson testified as an expert in clinical psychology relating to children with special needs. AR470. Among other things, Dr. Nelson discussed the comprehensive psychological evaluation she had performed on B.G. in July 2017 and her September 2017 recommendations based on that evaluation. AR472–87. Dr. Nelson testified that she had recommended that B.G. receive (1) fifteen hours per week of specialized instruction in reading and math, meaning B.G. would be "pulled out of the general education classroom"; and (2) "inclusion supports" in all other subjects, meaning B.G. would have "a special ed teacher in her general ed classroom who helps her with her work for every other subject." AR501; *see also* AR484. Dr. Nelson stated that based on B.G.'s testing performance, she "knew that just having 10 hours of special education support would not be enough, especially with the social-emotional component that's involved." AR487. Dr. Nelson viewed "the general education setting [as] inadequate" because B.G. had "severe problems with tuning out extraneous information" and needed to be in "a smaller group setting, outside general ed." AR489. Dr. Nelson testified that since her July 2017 evaluation, B.G.'s "behaviors [had] escalated," her "grades [had]

dropped," and "[s]he was skipping classes consistently." AR488. Accordingly, in Dr. Nelson's opinion, her original fifteen-hour per week recommendation was no longer adequate because B.G. "need[ed] a full-time special education IEP." AR488. In Dr. Nelson's view, by the time the DCPS team met in December 2017, B.G. "should've had the full-time IEP." AR490.

Dr. Gaines, B.G.'s education advocate and a participant in B.G.'s IEP process, testified at the hearing as a qualified expert in special education and IEP development. AR525–70. Dr. Gaines testified that B.G.'s academic and behavioral performance had deteriorated over the fall of 2017 and that, "[b]y November 22, 2017, [B.G.] was regressing and continuing to have trouble with her peer relationships." AR547; *see also* AR553. Dr. Gaines noted that between August 21, 2017 and October 13, 2017, B.G. "had a total of 19 disciplinary referrals." AR555–56. Dr. Gaines confirmed that at the October 2017 meeting, the DCPS team decided not to revise B.G.'s IEP in accordance with Dr. Nelson's recommendations but instead to implement a functional behavior assessment and behavior intervention plan "and to see how things were going." AR560. On December 6, 2017, Dr. Gaines again met with the DCPS team to discuss B.G.'s academic and behavioral decline. AR560–61. Dr. Gaines confirmed that B.G. was not given a full-time IEP until February 2018. AR564.

For its part, DCPS presented only one witness during the due process hearing: Ms. Walters, Kramer's Assistant Principal of Intervention. AR596. Ms. Walters was certified as an expert in special education programming and placement. AR591, 595. Ms. Walters testified that, from her perspective, B.G.'s behavioral problems, including

physical altercations with other students, were not "necessarily . . . attribute[able] to her disability." AR599. Ms. Walters further testified that during the fall of 2017, DCPS engaged in "a gradual process to try to keep [B.G.] in her least restrictive environment" because B.G. "wanted to stay in her least restrictive environment." AR608. In its closing statement, DCPS emphasized that Dr. Nelson's September 2017 report had not recommended that B.G. be placed "in a full-time setting" but instead that she receive fifteen hours per week of specialized instruction outside of general education and the remainder in inclusion support. AR658. DCPS acknowledged that an IEP should be "consistently" revised "based on whatever situation is going on," but it asserted that B.G.'s IEP team did not take too long to revise her IEP in this case. AR663.

On April 26, 2018, the independent hearing officer issued his determination, which concluded that DCPS had acted appropriately with respect to B.G.'s 2017–2018 IEP. AR3. The hearing officer acknowledged that, as to the specialized instruction component of B.G.'s IEP, "in retrospect" it was "understanabl[e]" for plaintiffs to "argue that DCPS was somewhat behind the curve and [B.G.] may have needed support a little sooner than provided." AR12–13. But, the hearing officer explained, "the proper analysis is to consider the situation prospectively"; "[v]iewed prospectively," it "was not at all clear" to DCPS at the time that B.G. "required a full-time IEP, especially when [Dr. Nelson] had recommended only 15 hours/week outside general education." AR13. Accordingly, the hearing officer found reasonable DCPS's decisions on October 25, 2017 to make no changes to B.G.'s specialized instruction and on December 6, 2017 to amend B.G.'s specialized instruction from ten hours per week within general education to add an

11

additional ten hours per week outside of general education. AR12. The hearing officer reached the same conclusion as to B.G.'s behavior support services, explaining that "viewed prospectively it was not clear how much [behavior support] would be needed to meaningfully address [B.G.'s] behavioral issues." AR13.

On July 20, 2018, plaintiffs brought this action claiming that DCPS denied B.G. a FAPE by failing to provide her with an appropriate IEP during the 2017–2018 school year. *See* Compl. at 9. On December 7, 2018, plaintiffs moved for summary judgment, *see* Pls.' Mot. for Summ. J. [Dkt. # 10], and on January 4, 2019, the District filed its cross-motion for summary judgment, *see* Def.'s Cross-Mot. for Summ. J. [Dkt. # 11]. Both motions are now fully briefed and ripe for decision.

**LEGAL STANDARD**

Under Federal Rule of Civil Procedure 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). A court presented with cross-motions for summary judgment must grant summary judgment only if one of the moving parties is entitled to judgment under the Rule 56 standard. *See Citizens for Responsibility & Ethics in Wash. v. U.S. Dep't of Justice*, 658 F.Supp.2d 217, 224 (D.D.C. 2009).

Under the IDEA, a "party aggrieved by the findings and decision" of the hearing officer may bring a civil action in federal court. *See* 20 U.S.C. § 1415(i)(2)(A). The reviewing court "(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the

preponderance of the evidence, shall grant such relief as the court determines is appropriate." *D.R. ex rel. Robinson v. District of Columbia*, 637 F.Supp.2d 11, 15–16 (D.C. Cir. 2009) (quoting 20 U.S.C. § 1415(i)(2)(C)). Accordingly, a summary judgment motion in this context "operates as a motion for judgment based on the evidence comprising the record and any additional evidence the Court may receive." *N.W. v. District of Columbia*, 253 F.Supp.3d 5, 12 (D.D.C. 2017) (quoting *D.R. ex rel. Robinson*, 637 F.Supp.2d at 16) (internal quotation marks omitted). Where, as here, no additional evidence is introduced, "the motion for summary judgment is simply the procedural vehicle for asking the judge to decide the case on the basis of the administrative record." *Q.C-C. v. District of Columbia*, 164 F.Supp.3d 35, 44 (D.D.C. 2016) (quoting *Heather S. v. Wisconsin*, 125 F.3d 1045, 1052 (7th Cir. 1997)) (alterations omitted). In such cases, judicial review of a hearing officer's determination "is not a true summary judgment procedure. Instead, the district court essentially conduct[s] a bench trial based on a stipulated record." *L.R.L. ex rel. Lomax v. District of Columbia*, 896 F. Supp. 2d 69, 73 (D.D.C. 2012) (internal quotation marks omitted).

A hearing officer's determination is afforded "less deference than is conventional in administrative proceedings." *Reid ex rel. Reid v. District of Columbia*, 401 F.3d 516, 521 (D.C. Cir. 2005) (internal quotation marks and citation omitted). However, although the reviewing court must "engage in a more rigorous review of the decision below," it must be mindful not to "substitute its own view of sound educational policy for that of the hearing officer." *G.G. ex rel. Gersten v. District of Columbia*, 924 F.Supp.2d 273, 278 (D.D.C. 2013) (internal quotation marks omitted). Courts must give "due weight" to the

13

administrative proceedings. *Westchester Cty. v. Rowley*, 458 U.S. 176, 206 (1982). Nevertheless, a hearing officer determination lacking "reasoned and specific findings deserves little deference." *Reid*, 401 F.3d at 521 (internal quotation marks and citation omitted); *B.D. v. District of Columbia*, 817 F.3d 792, 797 (D.C. Cir. 2016). The party challenging the determination below bears the burden of proof and must "at least take on the burden of persuading the [C]ourt that the Hearing Officer was wrong." *Reid*, 401 F.3d at 521 (citation omitted).

## DISCUSSION

Plaintiffs' complaint states a single cause of action: that DCPS denied B.G. a FAPE by failing to provide her with an appropriate IEP during the 2017–2018 school year. *See* Compl. at 9. Specifically, plaintiffs claim that the IEP was deficient in the amount of specialized instruction and behavioral support services that were afforded to B.G. up to February 2018, when she was placed in a behavior and education support program and her IEP revised to provide 27 hours per week of specialized instruction and four hours per month of behavioral support outside of general education. *See* Pls.' Mot. for Summ. J. at 3–4; AR329, 357.[3]

As the Supreme Court recently explained, an IEP must be "reasonably calculated to enable [the] child to make progress appropriate in light of the child's circumstances." *Endrew F. v. Douglas Cty. Sch. Dist. RE-1*, 137 S.Ct. 988, 999 (2017); *see id.* at 1001

---

[3] Plaintiffs have abandoned their requests below for a revised disability classification and placement in a therapeutic day school. *See* Pls.' Mot. for Summ. J. at 4 n.1.

("[A]dequacy . . . turns on the unique circumstances of the child."). Determining whether an IEP is substantively adequate requires a "fact-intensive" inquiry, as "crafting an appropriate program of education" for a given child entails "the expertise of school officials" as well as "the input of the child's parents or guardians." *Id.* at 999. Because the reviewing court should respect the "expertise and the exercise of judgment by school authorities," the inquiry is not whether the IEP is "ideal" but "whether the IEP is reasonable." *Id.* at 999, 10001; *see Rowley*, 458 U.S. at 206 (court may not "substitute [its] own notions of sound educational policy for those of the school authorities"). However, precisely because judicial deference is predicated on relative expertise and judgment, the "court may fairly expect [school] authorities to be able to offer a cogent and responsive explanation for their decisions," and their explanation should show why "the IEP is reasonably calculated" to ensure that the child "make[s] progress appropriate in light of his circumstances." *Id.* at 1002.

Plaintiffs challenge the substantive reasonableness of B.G.'s IEP at two discrete points—October 25 and December 6, 2017—the dates on which the DCPS team met to review and, if necessary, revise B.G.'s IEP. *See* Pls.' Mot. for Summ. J. at 12–17. By a preponderance, the evidence in the administrative record here shows that at least by December 6, 2017, the DCPS team had sufficient information to know that merely adjusting B.G.'s specialized instruction to add ten hours per week outside of general education was not reasonably calculated to enable B.G. to progress in light of her severe and steady regression.

From B.G.'s initial IEP in March 2017 to the December 2017 team meeting, B.G. had shown a consistent and troubling decline in academic and behavioral performance. After finishing the 2016–2017 school year with a failing grade in Science and near-failing grades in English and Reading Support, AR159–60, B.G.'s start to the 2017–2018 school year showed no signs of academic improvement. Quite the opposite, by October 2017 B.G. was failing Math, Science, English, and a Reading Workshop. AR194. And by December she was failing all of her classes, save music. AR253, 261–62. More troubling perhaps, B.G. had been involved in violent altercations and was racking up disciplinary referrals, and the consistent message from those who interacted with and observed B.G. was that she was academically disengaged, behaviorally self-destructive, and that there were no indications that B.G. was going to correct this downward spiral without serious administrative intervention. While a wait-and-see approach may have been defensible in October 2017, by December it was evident that B.G. needed more than tinkering at the margins of her weekly specialized instruction time. *See McLean v. District of Columbia*, 323 F.Supp.3d 20, 23 (D.D.C. 2018) (remanding for "hearing officer [to] consider [student's] regressive academic performance and behavioral troubles in the fall of 2016 when evaluating whether the" student's IEP denied him a FAPE).

To DCPS's credit, it took meaningful action in February 2018 to provide B.G. with a full-time IEP and place her in a behavior and education support program. *See* AR329, 357. But a subsequent adequate course of action cannot sanitize a prior inadequate decision, and the hearing officer erred in so concluding. *See* AR12 (hearing officer stating that "[t]he big picture" was DCPS's progression from the initial IEP "to a full-time IEP in

just over 10 months"). Rather, "[t]he key inquiry regarding an IEP's substantive adequacy is whether, taking account of what the school knew or reasonably should have known of a student's needs *at the time*, the IEP it offered was reasonably calculated to enable the specific student's progress." *Z.B. v. District of Columbia*, 888 F.3d 515, 524 (D.C. Cir. 2018) (emphasis added); *id.* (reviewing court must "evaluat[e] an IEP as of 'the time each IEP was created'" (quoting *Endrew F.*, 137 S.Ct. at 999)). Contrary to the hearing officer's determination, it was clear indeed when the DCPS team met in December 2017 that B.G. needed an intervention comparable to the full-time IEP she would receive just a few months later. At that time, the members of the DCPS team had before them Dr. Nathan's psychological report, Dr. Nelson's independent evaluation, social worker Smith's functional behavior assessment, and all of the teacher interview and observations summaries contained therein. And if that body of evidence left any doubt, the DCPS team was also acutely aware of the trends demonstrated in B.G.'s academic report cards and behavioral incident reports. In fact, the only addition to the record between December 2017 and the following February—aside from the filing of an administrative due process complaint—was the January 2018 classroom observation report. *See* AR283. That report reflected nothing about B.G.'s struggles that was not already documented tenfold in the existing record. The absence of any new evidence gathered before the team took appropriate action in February 2018 "sheds light on whether the IEP was objectively reasonable at the time it was" revised in December 2017. *See Z.B.*, 888 F.3d at 526.

Echoing the hearing officer, *see* AR12–13, the District counters that it could not have been expected to provide B.G. with *more* specialized instruction than B.G.'s own

17

independent psychologist, Dr. Nelson, had recommended in September 2017—i.e., fifteen hours per week of specialized reading and math instruction outside of general education and inclusion supports in all other classes, *see* Def.'s Cross-Mot. for Summ. J. at 21–22. Of course, the December 2017 revision to B.G.'s IEP did *not* adopt Dr. Nelson's recommendation in full; it provided only ten hours per week of specialized instruction outside of general education on top of the preexisting ten hours per week of within-general-education instruction. *See* AR247–49. But even if DCPS had "taken the independent testing recommendations . . . more seriously," *Davis v. District of Columbia*, 244 F.Supp.3d 27, 51 (D.D.C. 2017), our Circuit Court has cautioned against treating such proposals as dispositive. Instead, "[a] reviewing court must answer the predicate question whether—combined with all other relevant data—any assessment parents may have sought and funded on their own provided a materially accurate and adequate account of the student's circumstances." *See Z.B.*, 888 F.3d at 525.

In this case, while it may be that in October 2017 the DCPS team was not yet in a position to act on Dr. Nelson's recommendations, by December it was clear that B.G.'s circumstances had deteriorated to the point that even those recommendations were no longer adequate. Dr. Nelson testified as much at the due process hearing. *See* AR488. The fact that Dr. Nelson did not amend her independent evaluation to recommend a full-time IEP did not absolve DCPS of *its* statutory obligations under the IDEA to recognize the warning signs in B.G.'s circumstances and revise her IEP accordingly. This is hardly untrodden ground for DCPS; the school system has considerable experience working with students whose conditions require the prescription of a full-time IEP. *See, e.g., Wade v.*

18

*District of Columbia*, 322 F.Supp.3d 123, 132 (D.D.C. 2018) (student's IEP provided for

27.5 hours per week of specialized instruction outside of general education); *Johnson v.*

*District of Columbia*, 962 F.Supp.2d 263, 265 (D.D.C. 2013) (student's IEP provided for

31 hours per week of specialized instruction outside of general education); *G.B. v. District*

*of Columbia*, 78 F.Supp.3d 109, 112 (D.D.C. 2015) (student's IEP provided for 31 hours

per week of specialized instruction outside of general education). Dr. Nelson's "belatedly

obtained professional opinion" at the due process hearing supports the conclusion that there

was "a longstanding problem that [the] schools should have but failed to . . . account for"

fully in the preceding months. *See Z.B.*, 888 F.3d at 525.[4]   One would have hoped that

they had learned this lesson from prior experience.

    In sum, DCPS has failed to offer the "cogent and responsive explanation for [its

December 2017] decision[ ]" that would entitle it to deference. *See Endrew F.*, 137 S. Ct.

at 1001–02. The preponderance of the evidence available at the time shows that the

December 2017 IEP was not reasonably calculated to enable B.G. to make progress

---

[4] The District spends a great deal of time arguing, as assistant principal Walters testified at the hearing, *see* AR608, that the December 2017 decision was dictated by DCPS's adherence to the IDEA's "least restrictive environment" principle, which required DCPS to "gradually increase[e] B.G.'s level of services rather than immediately plac[e] her in a full-time program away from her non-disabled peers." Def.'s Cross-Mot. for Summ. J. at 20; *see* 20 U.S.C. § 1412(a)(5)(A) ("[t]o the maximum extent appropriate," a school district's special education accommodations should take place in the "least restrictive environment" available). But in cases where "education in regular classes . . . cannot be achieved satisfactorily," 20 U.S.C. § 1412(a)(5)(A), "the presumption in favor of mainstreaming [is] weighed against the importance of providing an appropriate education to [ ] students" with disabilities, *P. ex rel. Mr. & Mrs. P. v. Newington Bd. of Ed.*, 546 F.3d 111, 119 (2d Cir. 2008) (citation omitted). Here, by December 2017 that balance weighed demonstrably in favor of providing B.G. with a full-time IEP.

appropriate in light of her circumstances, which had deteriorated dramatically and demonstrably over the preceding months. Accordingly, the December 2017 IEP denied B.G. a FAPE.[5]

Plaintiffs seek a specific amount of compensatory education to redress for B.G.'s denial of a FAPE. *See* Pls.' Mot. for Summ. J. at 20. Compensatory education is an award of services "to be provided prospectively to compensate for a past deficient program." *Reid*, 401 F.3d at 522–23. Such an award "involves discretionary, prospective, injunctive relief crafted by a court to remedy what might be termed an education deficit created by an educational agency's failure over a given period of time to provide a FAPE to a student." *Id.* at 523. Nevertheless, under the circumstances the Court concludes that a remand is more appropriate. *See Middleton v. District of Columbia*, 312 F.Supp.3d 113, 153 (D.D.C. 2018) ("district courts in this jurisdiction frequently remand for such a determination"). The hearing officer in this case "is better situated than this Court to take additional evidence, to make further factual findings, and to evaluate [B.G.'s] current educational needs in designing the appropriate relief." *Id.* As such, the Court remands this matter to the hearing officer with instructions to "craft an award that 'aim[s] to place [B.G.] in the same place [she] would have occupied but for the school district's violation[] of [the] IDEA.'" *Henry v. District of Columbia*, 750 F.Supp.2d 94, 99 (D.D.C. 2010) (quoting *Reid*, 401 F.3d at 518).

---

[5] Because the December 2017 IEP was substantively inadequate in the amount of specialized instruction afforded to B.G., the Court needs not definitively resolve plaintiffs' remaining claims regarding the adequacy of the October 2017 IEP or the amount of behavior support services provided throughout the fall of 2017.

## CONCLUSION

For the foregoing reasons, plaintiffs' motion for summary judgment is **GRANTED** and defendant's motion for summary judgment is **DENIED**. A separate order consistent with this decision accompanies this Memorandum Opinion.

RICHARD J. LEON
United States District Judge